UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LAKISHA GRANT,<br><br>               Plaintiff,<br><br>   v.<br><br>T-MOBILE USA, INC.,<br><br>               Defendant. | CASE NO. 2:23-cv-01946-MJP<br><br>ORDER GRANTING MOTION TO COMPEL |

**INTRODUCTION**

This matter comes before the Court on Defendant T-Mobile USA, Inc.'s Motion to Compel Arbitration. (Dkt. No. 23.) Having reviewed the Motion, Plaintiff Lakisha Grant's Opposition (Dkt. No. 27), the Reply (Dkt. No. 29), and all supporting materials, the Court GRANTS the Motion.

**BACKGROUND**

Grant alleges she experienced a pattern of racial discrimination during her employment with T-Mobile in violation of federal and state law. (See First Amended Complaint ("FAC"),

1   Dkt. No. 21 ¶¶ 4.1–4.26.) Grant began working for T-Mobile in 2019 and was still an employee

2   when she filed her discrimination suit in December 2023. (See id. ¶ 3.3; see also Complaint (Dkt.

3   No. 1).) Four months after filing her suit, Grant was terminated and promptly amended her

4   complaint to include allegations that she was retaliated against by T-Mobile. (FAC ¶ 4.23).

5   **A.      The RSU Acceptance Process**

6           Nearly all T-Mobile employees are awarded annual stock grants of Restricted Stock Units

7   ("RSU"), which eventually become shares of T-Mobile stock. (Declaration of Aftab Ibrahim

8   ("Ibrahim Decl.") ¶ 4 (Dkt. No. 25).) Employees must accept their RSU awards through

9   NetBenefits, an online benefits portal used by T-Mobile. (Id.; Declaration of Aaron Westlake

10  ("Westlake Decl.") ¶ 3 (Dkt. No. 26).) To access the NetBenefits portal, employees must first

11  register for an account by providing their name, date of birth, and social security number, and

12  then log into the site using a self-selected username and password. (Ibrahim Decl. ¶ 4; Westlake

13  Decl. ¶¶ 3–4.) Once logged into the NetBenefits site, employees have access to various

14  documents—including fund information, legal notices, and account specific information—and

15  can accept RSU awards. (Westlake Decl. ¶¶ 3–4.)

16          On February 26, 2024, T-Mobile offered eligible employees the ability to accept their

17  RSU awards via the NetBenefits portal. (Westlake Decl. ¶ 4.) To accept their RSU awards,

18  employees were required to log into their NetBenefits account and then navigate to the grant

19  offer page. (Id.) At the grant offer page, employees were presented with an "Accept your award"

20  screen, which included the following:

ORDER GRANTING MOTION TO COMPEL - 2

> **Read these 3 documents from your company to accept your award**
>
> **Grant Agreement(PDF)**
> The Grant Agreement is a legal document that outlines the terms and conditions of your grant. Please direct any questions about this agreement to your plan administrator.
>
> **Plan Document(PDF)**
> The Plan Document details the terms of the plan and its administration. Please direct any questions about this Plan Document to your plan administrator.
>
> **Mutual Agreement to Arbitrate(PDF)**
> This Agreement requires final and binding arbitration of claims/disputes arising out of your employment relationship with T-Mobile. PLEASE READ IT CAREFULLY.
>
> By clicking "Accept your award", I confirm that I have opened, read, understand, and agree to the documents above, including the Mutual Agreement to Arbitrate. I understand those documents award me certain Restricted Stock Units and require me to resolve certain claims/disputes arising from my employment relationship with T-Mobile individually before an arbitrator, not a court or jury.
>
> **Accept your award**
>
> Decline award

(Westlake Decl. ¶ 7, Ex. 4.)

This acceptance screen instructed employees to: "[r]ead these 3 documents from your company to accept your award." (Westlake Decl. ¶ 7, Ex. 4.) Employees could take as much time as needed to review these documents, (Ibrahim Decl. ¶ 5,) and were advised to contact T-Mobile should they have any questions. (Westlake Decl. ¶ 7, Ex. 4.)

**B.     The Mutual Agreement to Arbitrate**

Among the documents employees were told to read and accept prior to receiving their RSU awards was a Mutual Agreement to Arbitrate ("Agreement"). (Westlake Decl. ¶ 6; Ibrahim Decl. ¶ 4.) The Agreement was reviewable by clicking on the document title, which was an underlined, hyperlink listed in black font and labeled "Mutual Agreement to Arbitrate(PDF)." (Westlake Decl. ¶ 7, Ex. 4.) Below the hyperlink, the acceptance screen warned employees that

ORDER GRANTING MOTION TO COMPEL - 3

1  "[t]his Agreement requires final and binding arbitration of claims/disputes arising out of your
2  employment relationship with T-Mobile. PLEASE READ IT CARFULLY." (Id. ¶ 6
3  (capitalization in original).) Upon clicking the hyperlink, employees were presented with a full-
4  size pop-out window containing the entire Agreement for their review. (Id. ¶ 6.)

5        The Agreement requires both employees and T-Mobile to arbitrate a broad range of
6  claims and disputes. (Ibrahim Decl., Ex. A.) The very top of the Agreement tells employees, in
7  bold font, that the Agreement "is a contract and covers important issues relating to [their] rights,"
8  and warns employees that it is their "sole responsibility to read it and understand [the
9  Agreement]." (Id.) The bolded text further informs employees that they are "free to seek
10 assistance from independent advisors of your choice" if they wish to do so. (Id.) The Agreement
11 provides that the "Federal Arbitration Act . . . applies to and governs this Agreement," and
12 confirms that the arbitration will be "administered by the American Arbitration Association
13 ('AAA')," under the "current Employment Arbitration Rules of the AAA ('AAA Rules')." (Id.)
14 The Agreement delegates to the AAA the "exclusive authority to resolve any dispute relating to
15 the scope, interpretation, applicability, enforceability, or waiver of this Agreement" (Id.) The
16 Agreement reads that "all claims or controversies," with few exceptions not at issue here, arising
17 in the "past, present, or future," are to be decided by an arbitrator, "and not by court or jury
18 trial." (Id. (emphasis in original).)

19       After reviewing the three documents, including the Agreement, employees could accept
20 their RSUs by clicking a green button on the acceptance screen labeled "Accept your award."
21 (Westlake Decl. ¶ 7, Ex. 4.) Immediately above the acceptance button was the following
22 warning:
23         "By clicking 'Accept my award', I confirm that I have opened, read,
      understand, and agree to the documents above, including the Mutual Agreement
24

ORDER GRANTING MOTION TO COMPEL - 4

to Arbitrate. I understand those documents award me certain Restricted Stock Units and require me to resolve certain claims/disputes arising from my employment relationship with T-Mobile individually before an arbitrator, not a court or jury."

(Westlake Decl. ¶ 6.)

When an employee clicked "Accept my award," the NetBenefits portal created an electronic record of their acceptance. (Westlake Decl. ¶ 8.) The electronic record included a version of the Agreement stamped with both the time and date of acceptance along with an identification number unique to each transaction. (Id.) Employees could then review their record of acceptance, including the Agreement, at any time by logging into their NetBenefits account. (Id. ¶ 9.)

C.      **Grant accepts her RSU awards.**

On February 26, 2024, Grant accepted her RSU awards. (Ibrahim Decl. ¶ 6.) To do so, she clicked the "Accept my award" button, prompting the NetBenefits portal to electronically her acceptance of the Agreement. (See Ibrahim Decl., Ex. A; Westlake Decl. ¶ 10.)

Grant does not dispute that she accepted the RSUs. (See Declaration of Lakisha Grant ("Grant Decl.") ¶¶ 2–4 (Dkt. No. 28).) Grant does not remember seeing the documents or clickable hyperlinks on the acceptance screen nor does she remember being told to review those documents—including the Agreement—before accepting her award. (Grant Decl. ¶ 4.) Her "primary intention" for clicking the acceptance button was to receive employment benefits; she was unaware that by doing so she would be agreeing to arbitration of her existing claims. (Id. ¶ 5.) She asserts that the acceptance screen and Agreement (1) failed to "clearly communicate the significance of the arbitration agreement," (id. ¶ 5, 8;) (2) did not "adequately convey [to her] the importance of consulting [her] legal counsel," before she accepted, (id. ¶¶ 6–7;) and (3) was buried in a "routine process of accepting employment benefits." (Id. ¶¶ 8–10.) Grant contests that

ORDER GRANTING MOTION TO COMPEL - 5

she "did not knowingly or voluntarily assent" to arbitration of her discrimination claims against T-Mobile. (Id. ¶¶ 5, 8, 10.)

T-Mobile now seeks to enforce the arbitration agreement and compel Grant's employment discrimination claims to arbitration. (Dkt. No. 23.)

## ANALYSIS

**A.      Legal Standard**

Section 2 of the Federal Arbitration Act ("FAA") governs arbitration agreements in any contract affecting interstate commerce. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001). The FAA "reflect[s] both a liberal policy favoring arbitration . . . and the fundamental principle that arbitration is a matter of contract." AT & T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (cleaned up). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts . . . and must enforce them according to their terms." Id. (cleaned up); see also Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 67 (2010). Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable" unless invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. 9 U.S.C. § 2; Poublon v. C.H. Robinson Co., 846 F.3d 1251, 1259 (9th Cir. 2017).

The Court's authority to compel arbitration arises under Section 4 of the FAA. See In re Van Dusen, 654 F.3d 838, 843 (9th Cir. 2011); 9 U.S.C. § 4. The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." Norcia v. Samsung Telecomm. Am., 845 F.3d 1279, 1283 (9th Cir. 2017). The Court gives the party denying the existence of an agreement to arbitrate the benefit of all reasonable doubts and inferences, see Alarcon v. Vital Recovery Servs., Inc., 706 F. App'x 394, 394 (9th Cir. 2017) (citing Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,

925 F.2d 1136, 1141 (9th Cir. 1991)), and applies ordinary state law principles governing the formation of contracts. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Norcia, 845 F.3d at 1283.

When deciding whether to compel arbitration, the Court must "determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015); see also Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69 (2019) ("[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."). "However, these gateway issues can be expressly delegated to the arbitrator where 'the parties clearly and unmistakably provide otherwise.'" Brennan, 796 F.3d at 1130 (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)). "If the parties entered into a valid agreement to arbitrate, and the agreement delegates threshold arbitrability questions to an arbitrator by clear and unmistakable evidence, all other arbitrability issues . . . must be determined by an arbitrator." Henry Schein, 586 U.S. at 69 (cleaned up).

**B.     The Parties formed an agreement to arbitrate Grant's claims.**

T-Mobile argues that the Agreement is valid because both Parties "undisputedly manifested their assent to the Agreement." (Mot. at 11.) The Court agrees. Grant had both reasonable notice of the terms of the Agreement and then, by clicking the "Accept my award" button, manifested her mutual assent to those terms.

As a threshold matter, the Court "must resolve any challenge that an agreement to arbitrate was never formed." Caremark, LLC v. Chickasaw Nation, 43 F.4th 1021, 1030 (9th Cir. 2022). Under Washington law, "[m]utual assent is required for the formation of a valid contract," including agreements to arbitrate. Burnett v. Pagliacci Pizza, Inc., 196 Wn.2d 38, 48 (2020). "In

the context of online agreements, the existence of mutual assent turns on whether the consumer had reasonable notice of the terms of service agreement." Wilson v. Huuuge, Inc., 944 F.3d 1212, 1219 (9th Cir. 2019) (citing Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1177 (9th Cir. 2014) (applying Washington law).

While online agreements are varied, most "come primarily in two flavors: 'clickwrap' (or 'click-through') agreements . . . and 'browsewrap' agreements." Nguyen, 763 F.3d at 1175–76 (9th Cir. 2014). In a clickwrap agreement, "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 856 (9th Cir. 2022). Courts have "routinely found clickwrap agreements enforceable," and so "have devised rules to determine whether meaningful assent has been given." Id.

> "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."

Berman, 30 F.4th at 856 (citing Meyer v. Uber Technologies, Inc., 868 F.3d 66, 75 (2d Cir. 2017); Nguyen, 763 F.3d at 1173).

The Court finds the Agreement between Grant and T-Mobile to be a form of clickwrap agreement. Grant was presented with specific terms of the Agreement and was required perform an action—clicking a button—to proceed. The Court now analyzes both factors set forth in Berman to resolve the question of whether the agreement to arbitrate was formed.

1. *Reasonably conspicuous notice of the terms.*

First, the Court finds that the acceptance screen provided Grant with reasonably conspicuous notice of the Agreement's terms. To be reasonably conspicuous, "a notice must be

displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." Berman, 30 F.4th at 856. Hyperlinked terms constitute notice, but they "must be readily apparent," and "[s]imply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists." Id. at 857; see also Keebaugh v. Warner Bros. Ent. Inc., 100 F.4th 1005, 1014 (9th Cir. 2024).

The Court finds the Agreement hyperlink to be conspicuous enough that Grant should have seen it. The acceptance screen is uncluttered, the hyperlink to the Agreement is underlined and separated from other text by ample white space, and, importantly, is labeled with "(PDF)" next to the name of the document. (See Westlake Decl., Ex. 4.) There is a grey circle to the right of the hyperlink, (see id.,) but neither T-Mobile nor Grant address the existence or function of that circle, so it does not factor into the Court's analysis.

> Mutual Agreement to Arbitrate(PDF)
>
> This Agreement requires final and binding arbitration of claims/disputes arising out of your employment relationship with T-Mobile. PLEASE READ IT CAREFULLY.

(Westlake Decl., Ex. 4.)

The Court recognizes that the hyperlink is not presented in a different color than the rest of the text, i.e., blue, a "[c]ustomary design element[] denoting the existence of a hyperlink." Berman, 30 F.4th at 857; see also Oberstein v. Live Nation Ent., Inc., 60 F.4th 505, 516 (9th Cir. 2023) (agreeing that a reasonable user would have located Live Nation's terms of service when "crucially, the 'Terms of Use' hyperlink is conspicuously distinguished from the surrounding text in bright blue font."). However, the Court also recognizes that the hyperlink included the file type of the agreement, "(PDF)," immediately next to the full name of the Agreement. The Court finds that the inclusion and proximity of the file type in the hyperlinked text weighs in favor of a

1  reasonable user likely surmising that the underlined text "differ[ed] from other plain text in that
2  it provides a clickable pathway" to the Agreement. Berman, 30 F.4th at 857. Furthermore, the
3  color contrast between the hyperlink—black—and the background screen—white—was
4  conspicuous enough to allow Grant to easily see the Agreement hyperlink, rather than it being
5  obscured from view. Compare id. at 856–57 (text disclosing the existence of the terms and
6  conditions was inconspicuous when "printed in a tiny gray font considerably smaller than the
7  font used in the surrounding website elements, and indeed in a font so small that it is barely
8  legible to the naked eye.") with Keebaugh, 100 F.4th at 1020–21 (finding white text on a black
9  background the type of "contrasting font color" sufficient to show conspicuous notice of the
10 terms) (citing Oberstein, 60 F.4th at 516) and Pizarro v. QuinStreet, Inc., No. 22-CV-02803-
11 MMC, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022) (black underlined hyperlink was
12 adequately contrasted with white background).

        2.     *Unambiguous manifestation of assent to the terms.*

Second, the Court finds that by clicking the "Accept your award" button, Grant unambiguously manifested her assent to the terms of the Agreement. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." Berman, 30 F.4th at 857; see also Briggs v. Service Corp. International, No. C22-1646-JLR, 2023 WL 2075958 (W.D. Wash. Feb. 17, 2023) ("Acceptance may be manifested expressly, such as by checking a box or clicking on a button.") (citing Okelo v. Antioch Univ., 601 F. Supp. 3d 894, 897–98 (W.D. Wash. 2022)).

Here, Grant was explicitly advised that by clicking "Accept your award," she would be agreeing to arbitrate. Grant logged into her NetBenefits account via a unique username and

password, navigated to the acceptance screen, and accessed the RSU acceptance screen, which instructed her three separate times to read the agreements. She then clicked the "Accept my award" button, (Grant Decl. ¶ 5,) which was immediately below text stating:

> "By clicking 'Accept my award', I confirm that I have opened, read, understand, and <u>agree</u> to the documents above, <u>including the Mutual Agreement to Arbitrate</u>. I understand those documents . . . <u>require me to resolve certain claims/disputes arising from my employment relationship with T-Mobile individually before an arbitrator, not a court or jury</u>."

(Westlake Decl. ¶ 6 (emphasis added).)

This language was conspicuous and clearly notified Grant that by clicking the green "Accept my award" button located after the text, she would be bound by the Agreement. See Nguyen v. Barnes & Noble, 763 F.3d 1171, 1176 (9th Cir. 2014) (recognizing the enforceability of clickwrap agreements "where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website"); see also Reed v. Scientific Games Corp., No. C18-0565-RSL, 2021 WL 2473930, at *3 (W.D. Wash. June 17, 2021) (finding that upon clicking a "big green button," plaintiff "manifested an intention to agree to the terms and conditions offered by defendant.").

Grant had both reasonably conspicuous notice of the terms of the Agreement and then expressly manifested her assent to be bound to those terms. Therefore, the Court finds that the Parties entered into a valid agreement to arbitrate.

Grant argues that the agreement was never formed because her "clicking through" the acceptance screen did not constitute assent. (Opp. at 8.) Specifically, Grant challenges the formation of the Agreement because it "fail[ed] to clearly and conspicuously communicate the importance and potential impact of the arbitration agreement," (Opp. at 10,) particularly while being "buried in referenced documents." (Opp. at 11.) The Court disagrees. Grant was explicitly told—in conspicuous, capitalized letters—to "PLEASE READ [THE AGREEMENT]

ORDER GRANTING MOTION TO COMPEL - 11

1    CAREFULLY," because her acceptance of the employment benefits would bind her to
2    arbitration. (See Westlake Decl. ¶ 6.) And that the Agreement itself was found in a separate PDF
3    document is of little consequence because the acceptance screen "referenced the arbitration
4    policy, summarized in plain language what that entailed, and provided a link with access to the
5    full text of the [Agreement]." Okelo, 601 F. Supp. 3d at 898; see also Briggs, 2023 WL 2075958,
6    at *4 ("Courts have consistently found hyperlinks to the express terms of an agreement in
7    proximity to electronic acknowledgments to be sufficient notice of the terms.") (citing Wiseley
8    v. Amazon, 709 F. App'x 862, 864 (9th Cir. 2017)).
9           Despite this ruling, the Court does not condone the circumstances surrounding the
10   presentation and implementation of the Agreement. First, the Court disapproves of T-Mobile
11   directly asking Grant to retroactively waive her right to trial in a case that had already been filed,
12   rather than making the request through her counsel. This is a poor (if not unethical) practice and
13   should not continue. See, e.g., ABA Comm. on Ethics & Pro. Resp., Formal Op. 11-461 at 4–5
14   (Aug. 4, 2011) (while attorneys may "give substantial assistance to a client regarding a
15   substantive communication with a represented adversary," they have an ethical obligation to
16   ensure that the communication does "overreach" into an improper contact with a represented
17   party). Indeed, some courts have found that "allowing [d]efendant to usurp [p]laintiff's claims,
18   and bind [them] to its dispute resolution program after [they] had essentially initiated his lawsuit
19   in the courts of the United States, is fundamentally and manifestly unfair, and contrary to public
20   policy." Wilcox v. Valero Ref. Co., 256 F. Supp. 2d 687, 691–92 (S.D. Tex. 2003). While the
21   outcome remains the same, this is not a practice that the Court finds appropriate or in the public
22   interest.

1    The Court's second concern is the implementation of the Agreement. The Agreement was
2    new as of February 26, 2024, and fundamentally altered how disputes between T-Mobile and its
3    employees were to be adjudicated. While the Court finds that there was adequate notice of the
4    Agreement on the acceptance screen, bundling a new arbitration agreement within the RSU
5    process is an ill-advised practice that may result in the erosion of trust between an employee and
6    their employer. To avoid the appearance of impropriety, companies seeking to introduce new
7    arbitration agreements should do so as a distinct and separate transaction, not as part of an annual
8    compensation award.

### C.    The Agreement delegates the remaining issues to the arbitrator.

Finding the Agreement to be validly formed, the Court's second inquiry must determine whether the Agreement "delegates threshold arbitrability questions to an arbitrator by clear and unmistakable evidence." Henry Schein, 586 U.S. at 69 (cleaned up). The Court finds that the Agreement contains both an express and an implicit agreement to delegate.

The Agreement includes an express delegation provision. Section 1 of the Agreement states that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the scope, interpretation, applicability, enforceability, or waiver of this Agreement." (Ibrahim Decl., Ex. A.) The Court recognizes this language as clear and unmistakable evidence that the Parties intended to delegate. See, e.g., Rent-A-Center, 561 U.S. at 66 (finding the same regarding a written delegation provision requiring "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to interpretation, applicability, enforceability or formation of this Agreement.").

1    The Agreement also includes an implicit delegation provision by incorporating

2 incorporates the AAA rules. The Agreement provides that the "Federal Arbitration Act . . .

3 applies to and governs this Agreement" and that the arbitration will be "administered by the

4 American Arbitration Association ("AAA")" and under the "current Employment Arbitration

5 Rules of the AAA ("AAA Rules")." (Ibrahim Decl., Ex. A.) By incorporating the AAA rules, the

6 language of the Agreement "constitutes clear and unmistakable evidence that contracting parties

7 agreed to arbitrate arbitrability." Brennan, 796 F.3d at 1130; see also G.G. v. Valve Corp., 799 F.

8 App'x 557, 558 (9th Cir. 2020).

9    Finding there to be a clear and unmistakable delegation provision, the Court must

10 "resolve any challenge directed specifically to the enforceability of the delegation clause."

11 Caremark, 43 F.4th at 1024; see also Bielski v. Coinbase, Inc., 87 F.4th 1003, 1011 (9th Cir.

12 2023) ("To sufficiently challenge a delegation provision, the party resisting arbitration must

13 specifically reference the delegation provision and make arguments challenging it.") (emphasis

14 added). Because Grant fails to specifically challenge—or even mention—the validity of the

15 delegation clause in her opposition, the Court finds the Parties agreed for all matters "relating to

16 the scope, interpretation, applicability, enforceability, or waiver," of the Agreement to be

17 decided by the arbitrator. (Ibrahim Decl., Ex. A.)

18    Because the Parties agreed to delegation, Grant's remaining challenges to the Agreement

19 as a whole, (see, e.g., Opp. at 14 ("The Mutual Agreement to Arbitrate constitutes and improper

20 solicitation of waiver . . ."); Opp. at 17 ("The Mutual Agreement to Arbitrate is not retroactive

21 on its face"); Opp. at 18 ("The Mutual Agreement to Arbitrate is unconscionable as a matter of

22 law"),) must be decided by the arbitrator. See Henry Schein, 586 U.S. at 69; see also Diaz v.

Nintendo of America Inc., C19-1116, 2020 WL 996859, at *1 (W.D. Wash. March 2, 2020) ("If an arbitration provision contains a delegation clause, the Court's inquiry ends.").

## CONCLUSION

The Court GRANTS T-Mobile's Motion to Compel Arbitration. By clicking the "Accept my awards" button, Grant manifested her mutual assent to be bound to the conspicuously displayed terms of the Agreement. The Court ORDERS that Grant's claims be sent to arbitration as per the terms of the Agreement. Grant's further arguments related to enforceability, waiver, and arbitrability of her dispute are to be decided by the arbitrator.

The matter is STAYED pending resolution of arbitration. See Smith v. Spizzirri, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding.").

The Parties are DIRECTED to file a joint status report within fourteen (14) days after the completion of arbitration, or, if arbitration remains pending, every six months from the date of this Order.

The clerk is ordered to provide copies of this order to all counsel.

Dated July 23, 2024.

Marsha J. Pechman
United States Senior District Judge